' James S. Brown, J.
The plaintiff, hereinafter referred to as ‘ ‘ the employer, ’ ’ sues two unions through their officers, to wit, LOCAL 1205 INTERNATIONAL BROTHERHOOD OF TEAMSTERS, AFL-CIO, hereinafter referred to as “ the Teamsters ” and the SEAFARERS INTERNATIONAL UNION, ATLANTIC AND GULF DISTRICT, AFL-CIO, hereinafter referred to as “the Seafarers”. Both are unincorporated associations. The suit is in equity for damages and for a permanent injunction to restrain these unions from ‘' agreeing, conspiring and combining to injure and destroy plaintiff’s good-will, trade, business and property,” and from “ continuing such agreements, conspiracy and combination ’ ’ and from ' ‘ stating that the plaintiff refused to bargain in good faith with, or is, unfair to ” the said unions and from “ interfering with, molesting or speaking to plaintiff’s customers and prospective customers and suppliers, or attempting to prevent such customers and suppliers and other from doing-business with plaintiff,” and from “ interfering * * * with plaintiff and plaintiff’s employees, customers and suppliers and the conduct of plaintiff’s business generally” and from ‘ ‘ picketing, patrolling, congregating or maintaining picket lines in front of, near or in the vicinity of plaintiff’s places of business, and places of business of persons or firms doing business with or seeking to do business with, or perform services for or making- deliveries to plaintiff ’ ’ and from '' creating a false impression that a labor dispute exists ’ ’ and from '' attempting to induce, persuade, coerce or intimidate any employees of suppliers of plaintiff and of any other person, firm or corporation with intent of affecting- or causing them to fail or refuse to perform services for or work for plaintiff or make deliveries of merchandise to the plaintiff or in any other manner not to *1021 deal with or transact business with the plaintiff ’ ’ and from “ announcing by placard, signs, circulars or any writing or orally that the plaintiff is unfair to defendants or union labor or that the employees of the plaintiff are on strike or adopting any procedure which conveys the false impression to the public that a labor dispute exists ’ ’ and for such other and further relief as may be proper.
The trial consumed seven days and over 1,100 pages of testimony were taken.
There is little, if any, dispute about these facts: The employer is a family-owned corporation which has been doing business for over 50 years and which manufactures marine life-saving and water sport equipment, with two plants, one at 124 Atlantic Avenue, and the other at 470 Claremont Avenue. On June 5, 1957 it had about 190 employees, about 150 of whom were employed in the manufacturing end and some 35 of whom were executives and white collar employees. Five employees were carried as truck drivers. The exact number is in dispute but by documentary and other proof plaintiff established that during the 12 months from June, 1956 to June, 1957 only two of these five were full-time drivers. The third had devoted 77% of his time to the work, while the fourth and fifth had been required to devote only 24% and 13% of their time to truck driving. !
On June 5, 1957 “ the Seafarers ” pickets appeared outside the two plants carrying placards reading “We appeal to the workers (of plaintiff) to join our union and enjoy the benefits of organization”. Commencing June 11, each picket carried a second sign, this one being of “ the Teamsters ” which proclaimed that the “ employees ” of the plaintiff were on strike. As will hereinafter be seen, the fact was “ the employees ” have never been on strike but on June 11 the five alleged truck drivers had walked out. On the day before these second picket signs appeared, three representatives of “ the Teamsters ” had called on plaintiff and said that they represented a majority of the drivers and wanted to talk about a union contract. No contract was presented but the employer said it would later get in touch with these union representatives; and then there was a further conference on June 11 between representatives of the employer and of both “the Teamsters” and “the Seafarers ” which was held at the Brooklyn Headquarters of “ the Seafarers.” After that conference had commenced, an officer of “ the Teamsters ” arrived and announced “ the drivers are out ’ ’ and then a representative of ‘ ‘ the Seafarers ’ ’ said to the employer’s representatives “ those are your drivers he’s talking *1022 about. ’ ’ A representative of the employer then asked the unions’ representatives if the picketing would stop if the employer signed up with “ the Teamsters ” but the' replies of the representatives of both unions were that “ the Seafarers ” would under such circumstances continue to picket and ‘ ‘ the Teamsters ” would not cross such picket line. At that same conference “ the Seafarers ” admitted that it did not represent a majority of the employees. It might be noted parenthetically that even at the time of trial its representative admitted that it had “ signed up ” only about 30 of the employees. This latter admission, however, was forthcoming reluctantly only after the inability of this organizer to produce the cards, upon direction of the court, of those who had signed up after he testified that he had ‘ ‘ slightly less than 100 ’ ’ signed up.
Later, on that same day (June 11, 1957) the employer telephoned “ the Seafarers ” organizer and informed him that it had decided to bring the matter before the National Labor Relations Board (NLRB), and later that day the employer did file with the said NLRB a petition requesting certification of some bargaining representative for all the employees.
On June 25, 1957 there was an informal conference in the office of a Mr. Bass, a field examiner of the NLRB which was attended by representatives of the employer and both defendant unions. At that time “ the Seafarers ” stated that it did not have a majority of the employees signed up and made no claim for recognition; and when the field examiner asked the attorney for “ the Seafarers ” if it would “ disclaim ” in writing, such request was refused, the attorney stating that ‘ ‘ the Seafarers” could not “disclaim” since it had never ‘ ‘ claimed ’ ’ recognition.
On August 21, 1957 “ the Teamsters ” filed with the NLRB a petition requesting that it be certified as a representative of “ all truck drivers — excluding all other employees.”
On August 29, 1957 the factory employees held a meeting at which they formed their own independent union which is named “ The Life Saving Equipment Employees Union ” (hereinafter referred to as the “New Independent” union). This “ New Independent ’ ’ union is not a party to this action. However, the pledge cards and other documentary proof submitted by its officers on the trial show conclusively that 126 of the employees promptly joined it, these 126 representing about 80% of all the factory help. Three of the five alleged truck drivers signed with the “ New Independent ” union but upon the trial of this action two of them testified they had again changed their minds and preferred ‘ ‘ the Teamsters ’ ’ as their representative. This *1023 change of heart might well have been influenced by the strike pay of $50 to $65 a week paid to them by “ the Seafarers ” which, when added to the New York State unemployment compensation they have also been receiving, made their weekly income much greater than it was when they worked steadily prior to June 11.
On September 5, 1957 this “ New Independent ” union served upon the employer a demand for certification and the employer replied by letter dated September 10, 1957 reading in part: “As you must know, there are two other unions contesting to represent our employees and there are proceedings with regard thereto now pending at the NLRB. In the circumstances, we cannot recognize you as you request and you had better make such application as you see fit to make.” Then on September 19, 1957 this “New Independent” union filed with the NLRB a petition requesting its certification as representative of a unit including “ manufacturing, maintenance (and) truck driving employees.”
There has been no attempt by the defendants to deny that at the conference on June 11, when the employer inquired what would happen if it signed with ' ‘ the Teamsters ’ ’ alone, it was told it would have to sign with both unions and that ‘' meanwhile no material goes in and no material goes out.” Bight from June 11 on this “campaign” to keep the materials from going in or out of the buildings has been most zealously conducted by both unions, working together. The defendants make no secret of the fact that they have been working hand in hand since the very beginning of this “ campaign.”
The picketing has gone on continuously 5 to 7 days a week, sometimes 24 hours a day, and on occasion it has been extended to the place of business of plaintiff’s trucking contractor, to which further reference will be hereinafter made, and also to one of that trucker’s customers. ‘ ‘ The Seafarers ’ ’ readily admits that it has been mostly its men who have been following the trucks and that besides supplying “ the Teamsters ” with personnel it has also supplied money with which to make out-of-work payments to the drivers.
There has been one long series of altercations. One of the first was on June 26, when the vice-president of the plaintiff, while attempting to hack a truck out of one of the plants, was dragged from the driver’s seat, assaulted and thrown to the ground with the warning, “Don’t ever try that again.” His assailant was identified by this vice-president as an employee at “ the Seafarers ” headquarters who had accepted for the union some legal papers in this litigation. There was no denial *1024 by any of the defendants’ witnesses that this assault was committed by a “ Seafarers ” representative.
After this experience the plaintiff retained a trucking contractor, this contractor being a partnership consisting of two partners who own a few trucks. After a tryout week they agreed upon a charge of $50 a day for each partner, $25 a day for each assistant, and $75 a day for each truck supplied by the contractor. This latter charge was not made when the employer’s own trucks were used. These high rates are understandable when the hazards entailed are envisioned. Each time a truck pulled out to make deliveries, it was followed by from one to seven cars carrying representatives of both defendant unions, whose purpose was to make every effort to prevent deliveries being completed.
On an occasion on July 5, 1957, when two trucks were being unloaded at the Bay Ridge yard of the Long Island Railroad,. an altercation took place between six or seven representatives of the defendants and six men on the trucks. At that time the special policeman of the Long Island Railroad drew his revolver, aimed it at a representative of “ the Seafarers ” and threatened to shoot if he and his men failed to leave the yard. Then one of the defendants’ men parked his car in front of the exit of the railroad yard thereby preventing these trucks from leaving. It became necessary to summon police to have this car removed. When the trucks finally left the railroad yard, they were followed by these union representatives in several cars. Some witnesses said they numbered seven, but there were at least five. At 67th Street and 17th Avenue, near where the trucking contractor was about to garage its trucks, a collision took place between one of the trucks and a union car. There is a conflict in the testimony as to just how this happened, the trucker testifying this collision was caused by a union car trying to cut off a truck, while some union men testified that the truck deliberately stopped short and backed into the union car. In any event, one truck was caused to mount a sidewalk, six police squad cars were called and an ambulance was summoned and three or four of the participants were taken to the hospital.
There was another incident in the early morning of July 29 involving two union representatives, one of “ the Seafarers ” and one of ‘ ‘ the Teamsters ’ ’ who had been circling the block upon which the trucker had his place of business and who eventually parked their car nearby. The trucker, claiming that threats had been made on his life, called the police when he saw these men. Detectives and uniformed police responded. The *1025 union men were reluctant to identify themselves and resented being searched. It finally resulted in everyone going to the police station and an assistant district attorney and attorneys for both unions being summoned. After an informal hearing no further action was taken.
On another day when a truck was being followed by the defendants’ men a station wagon of the trucker blocked the union car at a place where the street was partially torn up. This resulted in the union car riding partly along the sidewalk for a distance in order to catch up with the fleeing truck.
On another occasion, on August 5, about which there was much conflicting testimony, an altercation took place in front of the trucker’s place of business which evidently is next door to the residence of his parents. The place was being picketed by several of the defendants’ men and there were threats and counterthreats of assault, all of which required police intervention.
There was another incident on August 6 involving the plant of the Miller Stormguard Corp. at No. 1680 Coney Island Avenue, whose trucking had been done by this same trucking concern. The representatives of the unions called there to prevail upon this company not to use this trucker and started to picket the Miller plant. This, too, led to an altercation which required police intervention.
On August 20 another incident occurred. It seems that one or more union cars were following one of the trucks on McDonald Avenue, when there was a rear-end collision between the truck and one of the union cars. The union representative involved testified that the truck deliberately stopped short and caused him to run into it. The truck driver testified to a different version.
On another occasion on August 29 in Pearl Street, Manhattan, two union cars, a truck and the trucker’s station wagon were all standing outside the place of a customer of the plaintiff. The union men were shouting to the customer’s men on the loading platform not to accept the materials that were being delivered. An altercation arose and a trucker claims that he was punched in the jaw by one of the two union men. That is denied by the union representative. Nevertheless, a large crowd gathered and the police were called and charges of assault were made in the Magistrates’ Court.
There was another incident on October 2, 1957 when one of the union cars was following one of the trucks down Atlantic Avenue and then on to Flatbush Avenue. The truckman claims *1026 that this particular truck was carrying rubbish and garbage to a dump in Flatbush. The union representative claims that along the route the truck deliberately stopped short on four occasions and backed up “ full speed about 10 or 15 feet ” in an effort to smash into his car. The trucker claims that it happened otherwise and that the union representative tried to cut him off on several occasions. This all took place early in the afternoon when Atlantic and Flatbush Avenues are always crowded with vehicles and pedestrians. This chase ended when both vehicles reached the intersection of Prospect Park West and Union Street, and then both the trucker and the union delegate telephoned to the police and made countercharges against each other. The police then evidently separated them and sent the truck on its way and delayed the car of the union representative. Those details were disputed but, nevertheless, the union representative’s car met up with the truck again at 39th Street and 16th Avenue later that afternoon. This led to another set-to and other calls to the police which resulted in the appearance of more than 4 squad cars with “ six uniformed cops, three detectives ’ ’ and the subsequent attendance of all the participants at a station house.
On another occasion a ‘ ‘ Seafarers ’ ’ photographer had been sent to take pictures around the plants of the employer. He testified that while he was standing outside some man from inside the plant came out and chased him and threw bricks at him. He also related that one of these bricks was thrown directly over the head of a policeman stationed outside that plant, but that when he and another union representative complained to that policeman, the policeman denied he had seen the brick being thrown. The other union representative, in testifying about the same incident, also swore that he saw several cars parked on the street outside of the plant with their windows and windshields smashed by such bricks and stones.
This photographer also stated there were police outside the plants a good part of the time. That is verified by the testimony of one policeman who said he had to be there at least twice a day. The testimony of one of the employers was that he had to summon the police on at least a dozen occasions.
Evidence was also presented showing that a fire and health hazard was created because the employees of the private rubbish and garbage carting concern employed by the employer refused to cross the picket lines. As a result, an order had to be issued by the fire department to compel removal of the garbage and rubbish.
*1027 Sometimes the trucks left singly but more often in convoys, fanning out along the route. The trucks were always followed by the ears of union representatives, which sometimes numbered as many as seven. It is quite obvious that this continuous, unrelenting and tenacious dogging was intended to harass as much as possible. The natural consequences were numerous incidents of name calling, threats, altercations, and even assaults, most of which have been referred to above. There have been several appearances in the Magistrates’ Court by both the truckers and the union men and more than one complaint and countercharge are still pending.
This course of behavior has not only been hazardous to the participants but most dangerous to the innocent bystanders and the community at large.
As has been pointed out above, when the plaintiff participated in the June 11 conference with the defendants’ representatives they insisted upon a package deal whereby the plaintiff would have to sign up with “ the Seafarers ” as well as “ the Teamsters.” This was in spite of the conceded fact that “ the Seafarers ” did not represent the employees. The plaintiff having been placed on the horns of a dilemma by such demands of the two unions reacted by presenting its petition to the NLRB.
Essentially, that situation remains unchanged today. The NLRB has pending before it the three petitions heretofore mentioned, one for certification by ‘ ‘ the Teamsters ’ ’ for a truck driver unit, one by the “ New Independent ” union for a unit of manufacturing, maintenance and truck driver employees and one by the employer for a unit of all employees.
This case therefore does not present any labor dispute but merely a contest between three unions. I find as a fact that the “ New Independent ” union actually does represent a majority of all the factory workers including the truck drivers. “ The Teamsters ” claims that it represents a majority of the truck drivers. Insofar as “ the Teamsters” and the “New Independent ” union are concerned, their status or lack of status will be determined by the NLRB. But “the Seafarers ”, by its own admission represents no group. Here, there is no labor dispute involving “ the Seafarers” within the contemplation of section 876-a of the Civil Practice Act and at most this union would have the right to conduct peaceful organizational picketing (Wood v. O’Grady, 307 N. Y. 532). However, this is the union which has been the moving spirit behind and has provided the funds for the combined co-ordinated activity of both defendants. I find that one of the objects of this picketing and *1028 the other conduct complained of was not to organize employees but to exert economic pressure upon the employer so that the employer would coerce its employees into joining “ the Seafarers.” This is an unlawful objective since it violates section 17 of article I of our State Constitution and sections 703 and 704 of the New York Labor Law and may be enjoined (Goodwins, Inc., v. Hagedorn, 303 N. Y. 300, 304, 305). In Metzger Co. v. Fay (4 A D 2d 436) the following language on pages 439, 440 is pertinent: “ There can no longer be any doubt about the power of a State court to enjoin picketing under circumstances where its Legislature or courts have adopted a public policy directed against picketing for unlawful objectives. The decision in Teamsters Union v. Vogt, Inc. (354 U. S. 284) makes this indisputably clear. In effectuating its own public policy, the courts do not intrench upon the pre-empted field of labor relations provided for in the Taft-Hartley Act.”
Since “ the Teamsters ” participated in this common strategy and combined with “ the Seafarers ” in the picketing and other conduct complained of for the unlawful purpose mentioned above, its conduct too may be enjoined. Furthermore, I find that the violent acts of defendants so permeate their operating procedure that if any further picketing by either defendant union were allowed it would be violent in nature and would require constant policing to keep it peaceful. Under such circumstances this court has the power to prohibit all picketing (Busch Jewelry Co. v. United Retail Employees’ Union, 281 N. Y. 150, 156). For these reasons the court hereby prohibits all picketing and the other conduct complained of, by both defendant unions. The injunctive relief granted herein, which covers all of the items of relief sought in the complaint, shall take effect immediately and the defendants are directed to comply with this direction forthwith. Plaintiff is awarded costs against both defendants.
So far as the first cause of action, which seeks to recover damages from the officers of the unions in their representative capacity, is concerned, this court is constrained to accept the law upon this subject as set forth in Martin v. Curran (303 N. Y. 276). Although that was a libel action, it was governed by section 13 of the General Associations Law which governs the present action. Under said statute an action to recover damages may not be maintained against the presidents or treasurers in their representative capacities, where the complaint contains no allegation that the individual members of the unions authorized or ratified the tort complained of. Liability is limited to *1029 cases where the individual liability of every single member can be alleged and proven. Since said allegation does not appear in the complaint and has not been proven, this cause of action is dismissed.
The above shall constitute the decision of this court.
Settle judgment on notice.